IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

OLGA RODRIGUEZ PALOMO,         )
                               )
              Petitioner,      )
                               )
    v.                         )        1:19CV884
                               )
DONALD RAY HOWARD,             )
                               )
              Respondent.      )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Petitioner Olga Rodriguez Palomo initiated this action by
filing a Verified Petition for Return of a Child under the
Convention on the Civil Aspects of International Child Abduction
(The "Hague Convention") ("Verified Pet."), (Doc. 1), seeking
return of her minor child, J.H.R., pursuant to the Convention on
the Civil Aspects of International Child Abduction, Oct. 25,
1980, T.I.A.S. No. 11,670 (the "Hague Convention"), and the
International Child Abduction Remedies Act, 22 U.S.C. § 9001 et
seq. ("ICARA"). Petitioner is seeking the return of J.H.R. to
Spain on the ground that her son was wrongfully removed from his
home country of Spain to Greensboro, North Carolina, by his
father, Respondent Donald Ray Howard, in violation of
Petitioner's custody rights.

For the reasons set forth below, the court will grant Petitioner's petition and order J.H.R. returned to Spain.

## I. BACKGROUND

Following the trial held on November 21, 2019, this court made findings of fact orally in open court. (Minute Entry 11/21/2019 ("Min. Entry 11/21/2019").) Those facts are incorporated by reference herein. The court finds the additional facts from the verified pleadings, as well as the evidence presented at the hearing. (Min. Entry 11/21/2019.)

Petitioner gave birth to J.H.R. in 2010 in Spain. (Verified Pet. (Doc. 1) ¶ 9.) Respondent is the father of the child. (Id.) Petitioner and Respondent were married in Spain in April 2010. (Id. ¶ 10.)

In October 2010, Petitioner, Respondent, and J.H.R. moved to Greensboro, North Carolina. (Id. ¶ 12.)

Petitioner told Respondent, in early 2014, that she wanted the family to move back to Spain. (Id. ¶ 13.) Respondent agreed. (Id.) Petitioner and J.H.R. moved to Spain first in April 2014, (id. ¶ 14), and Respondent moved to Spain in October 2014 to join them. (Id. ¶¶ 13, 15; Min. Entry 11/21/2019.)

After Respondent moved to Spain, he did not live with J.H.R. and Petitioner. (Min. Entry 11/21/2019.) J.H.R. lived with Petitioner in Petitioner's mother's apartment during this time. (Verified Pet. (Doc. 1) ¶ 17; Min. Entry 11/21/2019.)

- 2 -

On October 24, 2014, Petitioner initiated divorce proceedings in the Court of First Instance No. 27 of Madrid. (Verified Pet. (Doc. 1), Ex. D, June 18, 2019 Spanish Court Decision ("June 18, 2019 Decision") (Doc. 1-4) at 16.)[1] The Spanish court tried to summon Respondent by telephone on April 27, 2016, for a hearing on Petitioner's custody and divorce filing. (Id. at 18.) When he refused to come, the court entered a procedural default. (Id.) That court issued a ruling on May 20, 2016, granting Petitioner sole custody of J.H.R., along with a divorce. (Id. at 16.)

Respondent appealed this order, arguing that he was deprived of due process for failure to receive notice of the proceedings. (Id. at 17.) On September 26, 2017, the Provincial Court of Madrid, the Spanish appellate court, annulled the existing Spanish custody order granting Petitioner sole custody and ordered further proceedings. (Verified Pet. (Doc. 1) ¶ 22; June 18, 2019 Decision (Doc. 1-4) at 17–19.) The Provincial Court agreed with Respondent and declared that he "had been left defenseless" to those proceedings. (June 18, 2019 Decision (Doc. 1-4) at 18.) The Provincial Court also found that, at the time

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

of the 2014 Spanish custody and divorce proceedings, Petitioner knew that Respondent had initiated custody proceedings in Guilford County Superior court, and that she failed to tell the Provincial Court of these proceedings. (Id. at 19.) This order, however, did not divest Petitioner of custody rights. (Id.) While Petitioner was pursuing divorce in the Spanish courts, Respondent filed an ex parte temporary custody petition in the Guilford County Superior Court. (Brief in Support of Respondent's Motion for Summary Judgment (Doc. 13), Ex. 1, Respondent's Affidavit ("Resp't's Aff.") (Doc. 13-1) ¶ 27.) The Guilford County Superior Court entered a Permanent Custody Order granting Respondent sole custody on July 1, 2015. (Petitioner's Memorandum in Support of Her Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (Doc. 10), Ex. A, Guilford County Order (Doc. 10-1) at 2.)

In August 2018, J.H.R. had been living in Spain with Petitioner for four years. (Verified Pet. (Doc. 1) ¶ 37.) Petitioner and Respondent were engaging in custody negotiations. (Id. ¶ 22.) Respondent and Petitioner agreed in writing that J.H.R. would go on vacation with Respondent for two weeks. (Id.) Respondent instead took J.H.R. to North Carolina. (Resp't's Aff. (Doc. 13-1) ¶¶ 50, 52–53.)

Petitioner went to the Court of First Instance in Madrid and received an order on September 7, 2018, which stated that it

was in the interest of the child not to illicitly transfer him

or remove him from his habitual residence with his mother.

(Verified Pet. (Doc. 1), Ex. C, Sept. 7, 2018 Order (Doc. 1-3)

at 9.) This order further dictated that Petitioner would

exercise care and custody of the child and prohibited the

removal of the child from Spain without judicial authorization.

(Id. at 11.)

On January 22, 2019, Petitioner filed a Request for Return

Application under the Hague Convention with the Central

Authority for Spain. (Verified Pet. (Doc. 1), Ex. G, Request for

Return (Doc. 1-7).)

On June 18, 2019, the Court of First Instance No. 27 of

Madrid issued an order concerning the return of J.H.R. to

Petitioner. (June 18, 2019 Order (Doc. 1-4).) In that order, the

Spanish court held that Respondent's transfer of J.H.R. to

Greensboro, North Carolina, constituted an illicit transfer in

violation of Article 3 of the Hague Convention of 1980. (Id. at

26.) The Spanish court found that Petitioner was exercising

legitimate custodial rights over J.H.R. at the time Respondent

took the child to the United States. (Id.) The Spanish court

also found that J.H.R.'s habitual residence was Madrid, Spain,

where Petitioner had exercised lawful custody since 2014,

"without opposition from the father," that J.H.R. was enrolled

in school, that Respondent "did not present a claim for

- 5 -

restitution in the year that he was aware of the minor's whereabouts," and that Respondent lived in Madrid. (Id. at 25.)

On August 30, 2019, Petitioner filed the Verified Petition, seeking return of J.H.R. to Spain. (Doc. 1.) Service was executed on Respondent on September 11, 2019, (Doc. 4), and Respondent filed his Answer on September 26, 2019, (Doc. 5). Petitioner requested a hearing on her Verified Petition, and a hearing was set for October 29, 2019, (Doc. 6).

Respondent filed a counterclaim, bringing one claim for fraud and four claims for abuse of process. (Doc. 7.) Petitioner filed a Motion to Dismiss for Failure to State a Claim. (Doc. 9.) Respondent filed a Motion for Summary Judgment on November 19, 2019, (Doc. 13), and a Motion to Dismiss on November 20, 2019, (Doc. 14).

The court held a trial on November 21, 2019. (Min. Entry 11/21/2019.) At trial, Respondent voluntarily withdrew his counterclaims. (Id.) At the end of the trial, this court made several factual findings and issued its order granting the petition. (Min. Entry 11/21/2019.) Respondent filed a motion for reconsideration on November 22, 2019.[2] (Doc. 15.)

---

[2] Because Respondent's motion for reconsideration consists of case studies for two cases already contained in his motion to dismiss, (Doc. 14), the court will not separately respond to the motion for reconsideration.

- 6 -

## II. ANALYSIS

### A. Petitioner's Prima Facie Case

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented through ICARA, was created with the purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." International Child Abduction Convention, 1988 WL 411501 ("Hague Convention"). "[T]he primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001) (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993)).

A court considering a Hague Convention petition ("Hague petition") has jurisdiction only over the wrongful removal or retention claim. See Hague Convention, art. 16.

In order to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that the child "has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1). A petitioner must prove the following to establish a prima facie case of wrongful removal: "(1) the child was 'habitually resident' in

the petitioner's country of residence at the time of removal,

(2) the removal was in breach of the petitioner's custody rights

under the law of his home state, and (3) the petitioner had been

exercising those rights at the time of removal." Bader v.

Kramer, 484 F.3d 666, 668 (4th Cir. 2007). Once a petitioner has

made out a prima face case of wrongful removal, "return of the

child is required unless the respondent establishes one of four

defenses." Id.

> Two of the defenses must be supported by clear and
> convincing evidence: (1) that return would expose the
> child to a "grave risk" of "physical or psychological
> harm or otherwise place [the child] in an intolerable
> situation" and (2) that return of the child would not
> be permitted by "fundamental principles of the United
> States relating to the protection of human rights and
> fundamental freedoms." The other two defenses may be
> supported by a preponderance of the evidence: (1) that
> the petition for return was not filed within one year
> of the removal and the child is now well-settled in
> another country, and (2) that the petitioner was not
> actually exercising h[er] custodial rights at the time
> of the removal or had consented to or acquiesced in
> the removal.

Id. at 668–69.

## 1. **J.H.R.'s Habitual Residence**

Petitioner contends that J.H.R.'s habitual residence was

Spain at the time Respondent took him. (Verified Pet. (Doc. 1)

¶ 37.) Petitioner bases this assertion on that fact that the

child "lived with Petitioner continuously in Spain from April

2014 until Respondent wrongfully removed him from Spain." (Id.)

The first prong of the wrongful removal prima facie case requires the court to determine the location of the child's habitual residence. Bader, 484 F.3d at 668. The burden is on the petitioner to prove by a preponderance of the evidence that "the child was 'habitually resident' in the petitioner's country of residence at the time of removal." Id.

As the Fourth Circuit stated in Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001), "[t]he Hague Convention does not define 'habitual residence.'" The court, looking to its sister circuits, concluded that "there is no real distinction between ordinary residence and habitual residence." Id. "A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." Id. (quoting Friedrich, 983 F.2d at 1401). "This is a fact-specific inquiry that should be made on a case-by-case basis." Id. Importantly, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." Id.

"Federal courts have developed a two-part framework to assist in the habitual residence analysis." Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009). First, the court must determine "whether the parents shared a settled intention to abandon the former country of residence." Id. (citing Mozes v. Mozes, 239 F.3d 1067, 1075 (9th Cir. 2001)). Second, the court

determines "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the [child] to the new environment.'" Id. (quoting Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007)).

The court will address each part in turn.

### a. Parental Intent

The Fourth Circuit has adopted the Ninth Circuit's framework for determining parental intentions in Hague Convention cases, due to the "[d]ifficulty [that] arises . . . when the persons entitled to fix the child's residence no longer agree on where it has been fixed—a situation that, for obvious reasons, is likely to arise in cases under the Convention." Maxwell, 588 F.3d at 251.

Under this framework there are three factual categories of cases. "In the first category are cases where 'the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move.'" Id. (quoting Mozes, 239 F.3d at 1076). In this category, "[w]hen courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled

- 10 -

purpose." Mozes, 239 F.3d at 1077). Second "are those cases 'where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period.'" Maxwell, 588 F.3d at 251 (quoting Mozes, 239 F.3d at 1077). In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence. Id. Finally, the "third category of cases is comprised of '[i]n between cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration.'" Id. (quoting Mozes, 239 F.3d at 1076–77.) "Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely," and it is thus reasonable to infer "a mutual abandonment of the child's prior habitual residence." Mozes, 239 F.3d at 1077. "Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent form which such abandonment can be inferred." Id.

There are several factors that may serve as evidence of parental intent:

parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability;

the retention of close ties to the former country; the
storage and shipment of family possessions; the
citizenship status of the parents and children; and
the stability of the home environment in the new
country of residence.

Maxwell, 588 F.3d at 252.

        Respondent contends that J.H.R.'s habitual residence is

North Carolina. (Respondent's Motion to Dismiss ("Resp't's Mot.

to Dismiss") (Doc. 14) at 5.) In particular, he states that

"[w]hen an agreement allowing a child to enter another country

is conditioned upon the ability of the left behind parent to

reunite with the family and that condition is frustrated, the

child does not acquire a new habitual residence within the

meaning of Article 12 of the Hague Convention." (Id. at 2.) He

premises this assertion on a paper written by the Honorable

James D. Garbolino, The 1980 Hague Convention on the Civil

Aspects of International Child Abduction: A Guide for Judges

(2015), and on two cases cited in that paper in the section

entitled "Stranded Parents," Mota v. Castillo, 692 F.3d 108 (2d

Cir. 2012) and Hofmann v. Sender, 716 F.3d 282 (2d Cir. 2013).

(Id. at 3–4.)

        In Mota, the father traveled from Mexico to New York to

find work, while the child and the mother remained in Mexico.

Mota, 692 F.3d at 109. The parents had the child smuggled into

the United States, where she lived with her father. Id. The

mother, however, repeatedly and unsuccessfully tried to gain

entrance into the country. Id. at 109-10. The mother then filed a Hague petition in the United States. Id. at 111. The Second Circuit affirmed the district court's holding that Mexico was the child's habitual residence, stating, "[the mother]'s intention that [the child] live in the United States only if she, as mother, were able to join [the child] there is dispositive of our determination of [the child]'s habitual residence." Id. at 115. The Second Circuit further noted that "[w]ere [the mother] unable to join her daughter in America, [the child]'s stay would be temporary, and the daughter would rejoin her mother in Mexico." Id.

Hofmann applied the holding in Mota to a situation involving a Canadian father and an American mother who had two children in Canada. Hofmann, 716 F.3d at 285. In August 2011, the respondent mother moved with the two children to New York to be near her family, as well as to begin the family's relocation process. Id. at 286. During this time, the petitioner father stayed in Canada while periodically visiting the rest of the family in New York. Id. The petitioner and respondent opened up a joint bank account in New York in September 2011, and their oldest child began attending school in New York at around the same time. Id. at 286-87.

However, the district court noted, critically, that the parties "had not reached the unequivocal decision to relocate to

- 13 -

New York" on the date the mother moved the children to New York. Id. at 287 (internal quotation marks omitted). Indeed, "[a]lthough [the respondent mother] had abandoned her pursuit of Canadian citizenship by this point, the court found that as late as November and December of 2011, the parties were still considering the possibility of permanently settling in a new residence in Montreal." Id. Further, the respondent mother "continued to receive certain tax credits and maternity leave from her job in Montreal," and that "[t]hose payments were predicated precisely on the understanding that she would return to the job at some point in the future." Id. (internal quotation marks omitted).

The district court finally found that the parties believed that their relocation to New York was predicated on them doing so as a family. Id. The court credited both petitioner and respondent's testimony on this point, and that respondent's belief "was consistent with [his] other actions including his institution of this Hague Convention proceeding immediately after he was served with divorce papers." Id. (emphasis added).

### b. Acclimatization

In addition to consideration of the parties' shared intent, the court also considers the extent to which a child has acclimated to the new location in making the habitual residence determination. As noted above, the court also must determine

"whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the [child] to the new environment.'" Maxwell, 588 F.3d at 251 (quoting Papakosmas, 483 F.3d at 622).

> The question here "is not simply whether the child's life in the new country shows some minimal degree of settled purpose," but whether the "child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed."

Id. at 253–54 (quoting Mozes, 239 F.3d at 1081). "Federal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age to determine the extent of a child's acclimatization to the new country of residence." Id. at 254.

### c. J.H.R.'s Habitual Residence

Petitioner contends J.H.R.'s habitual residence is Spain, (Petitioner's Trial Brief (Doc. 12) at 7–8), and Respondent contends that J.H.R's habitual residence did not change from North Carolina when they moved to Spain in 2014, (Resp't's Mot. to Dismiss (Doc. 14) at 5). It is undisputed that Petitioner, Respondent, and J.H.R. all lived in Spain from 2014 to 2018. (Verified Pet. (Doc. 1) ¶¶ 14, 17, 23; Def.'s Answer (Doc. 5) ¶¶ 14, 17, 23.)

Because the parties do not address whether J.H.R. was acclimated to Spain, the court will briefly address it before

turning to the more difficult question of parental intent. Considering the factors laid out in Maxwell leads the court to conclude that J.H.R. was acclimated to Spain. First, J.H.R. spent the first four years of his life in North Carolina, during which time he was an infant and a toddler, whereas he spent ages four to eight in Spain. He was enrolled in school in Spain, and Petitioner submitted evidence of their robust social life there: photos of birthday parties, of posters from friends at school saying they missed him, and of J.H.R. with family in Spain. The court concludes that Petitioner has met her burden of proving by a preponderance of the evidence J.H.R. was acclimated to life in Spain.

Parental intent poses a more complicated issue. Regarding the three parental intent categories, it is plain to the court that the present case falls into the first category: "the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." Maxwell, 588 F.3d at 251. Respondent admitted at the trial that it was their intent to remain in Spain, in his view, as husband and wife. (Min. Entry 11/21/2019.) However, Respondent also testified that he stayed in Spain to be close to his son. (Id.) Further, Respondent and Petitioner either rented out their Greensboro house or were planning on selling it after moving to Spain, and Petitioner and J.H.R. had Spanish

citizenship. (Id.) The court also found that, while the parties take different positions as to what occurred in the marriage, there were discussions about Respondent joining Petitioner and the child in Spain. (Id.) There was no evidence presented at trial that the apartment of Petitioner's mother, where Petitioner and J.H.R. lived in Madrid, was an unstable home environment. The court also emphasizes that Respondent himself lived in Spain from October 2014 to August 2018 and applied for and received residency as the father of a Spanish national, even after learning that his wife was divorcing him. (Id.) These factors together lead the court to conclude that Petitioner has met her burden of proving by a preponderance of the evidence that the last shared parental intent was to make Spain J.H.R.'s habitual residence, either as a family or not.

Moreover, even if Petitioner thwarted the intent to live in Spain as a family, and thus the last shared parental intent was for the United States to be J.H.R.'s habitual residence, as Respondent claims, the court distinguishes this case from the fact patterns of Mota and Hofmann.

In contrast to the petitioner in Mota, Respondent here was able to enter Spain; he was not barred from joining J.H.R. in the country. In fact, he testified at trial that he spent over 40 days with the child in Spain. (Min. Entry 11/21/2019.) Mota involved a "stranded parent," Garbolino, supra, at 105, whereas

the present facts do not indicate a case of a stranded parent who cannot enter the country to be with the child; Respondent admits that he lived in Spain for four years, saw his son, and gained Spanish residency as the father of a Spanish national. (Answer (Doc. 5) ¶ 37; Min. Entry 11/21/2019.) Mota is thus inapplicable to the facts in this case.

Nonetheless, the court acknowledges that the present case and Hofmann bear similarities. In both, mothers went to new countries with their children, followed by fathers whom the mothers promptly divorced.

However, even taking Respondent's view of the facts, there is at least one material fact distinguishing the two cases: Respondent did not file his own Hague petition once he realized his wife wanted a divorce and that the intention of living in Spain as husband and wife was thwarted. Unlike the respondent father in Hofmann, who immediately filed Hague Convention proceedings upon being served with divorce papers, Respondent chose the route of inaction under the Hague Convention. He never filed a Hague petition. Instead, he lived in Spain for four years until he engaged in self-help and illegally removed his child in conscious disregard of a contract he had signed, which is precisely what the Hague Convention was meant to prevent. See Miller, 240 F.3d at 401 n.13.

Indeed, Respondent testified that he stayed in Spain to be close to J.H.R. even after Petitioner divorced him. (Min. Entry 11/21/2019.) Thus, even if Petitioner wrongfully removed J.H.R. to Spain in the first place, which the court does not find occurred, Respondent went along with this arrangement for four years. Indeed, while Respondent may point to his 2015 Guilford County custody order as evidence of action taken, Respondent did not act on that order for over three years. Instead, he obtained Spanish residency as the father of a Spanish national and played at least a nominal role in J.H.R.'s life in Spain. (See Min. Entry 11/21/2019.)

Hofmann is therefore not applicable to the facts here. If Respondent wanted to avail himself of the thwarted intent defense as stated in Hofmann, Respondent should have filed a Hague Petition in 2014, not waited four years before absconding with his child to another continent.

Two Sixth and Seventh Circuit cases provide clarity as to the impact of Respondent's decision to not file a Hague petition back when Petitioner divorced him. See Moreno v. Zank, 895 F.3d 917 (6th Cir. 2018), cert. denied, ____ U.S. ____, 139 S. Ct. 1323 (2019); Kijowska v. Haines, 463 F.3d 583 (7th Cir. 2006). The present case bears striking similarities to the situation in Moreno. There, the child was born in Michigan to an American father, the respondent, and an Ecuadorian mother, the

petitioner. Moreno, 895 F.3d at 920. The couple divorced while still living in Michigan. Id. Pursuant to the custody order, the petitioner could not take the child to Ecuador without the respondent's permission. Id. The petitioner did just that, and absconded with the child to Ecuador in December 2009. Id. The respondent got a court order from the Michigan state court, granting him full custody. Id. The respondent then began the process of filing a Hague petition, but did not finish the process. Id. In the meantime, the child lived in Ecuador from the ages of three to ten, and the district court found the child had become acclimated to Ecuador. Id. at 921. The respondent periodically visited the child for four years. Id. at 921–22. In 2016, after the child had visited the respondent in Michigan at least twice before, the respondent failed to send the child back to Ecuador at the end of their visit. Id. at 922. The petitioner mother filed a Hague petition in U.S. District Court alleging wrongful removal. Id. The district court found that, because the petitioner mother had wrongfully absconded with the child to Ecuador in the first place, Ecuador could not have become the child's habitual residence, and that the United States was in fact the child's place of habitual residence. Id.

The Sixth Circuit reversed, noting that "[t]he Convention . . . seeks to avoid the harms to a child's well-being that come from being torn from the surroundings to which

the child has been accustomed." Id. at 924. The court found that

the [mother's] potentially illegal actions in the first place

were "not enough to trump the acclimatization standard, at least

where [the respondent] failed to pursue all treaty-based

remedies in Ecuador to secure [the child]'s return to the United

States." Id. at 924. The Sixth Circuit stated that

> if Convention procedures are not fully pursued when a
> child is first abducted, it makes little sense to
> categorically permit later self-help abduction in the
> other direction, after the child has been acclimatized
> in the second country. First, permitting re-abduction
> results in a total disregard for the limits that the
> Convention puts on the remedy for the first abduction,
> such as time limits, and exceptions for the child's
> welfare or mature preference. Second, permitting
> abduction for a second time carries the same threat to
> the child's well-being of being torn from an
> accustomed residence. The Convention scheme achieves
> its purposes only if Convention processes are applied,
> with applicable exceptions, each time a child is
> abducted from a country in which the child has been
> acclimatized.

Id.; see also Ovalle v. Perez, 681 F. App'x 777, 779 (11th Cir.

2017) (holding that a respondent father's failure to file a

Hague petition weighed in favor of finding the child's habitual

residence was in the petitioner's country).

The Seventh Circuit expressed a similar principle in

Kijowska v. Haines, 463 F.3d 583 (7th Cir. 2006). There the

court asserted the following alternative reasoning regarding the

habitual residence of a child born in the United States, taken

to Poland by her mother, and then retaken by her father back

into the United States on the basis of an Illinois ex parte

custody order:

> Suppose that [the child]'s habitual residence when her
> mother took her to Poland in December 2004 was the
> United States and that [her mother]'s removal of her
> was wrongful. [The father]'s remedy would have been to
> file a petition under the Hague Convention and its
> implementing federal statute. He did not do that. He
> merely sought a custody order from an Illinois state
> court and then used that order to help obtain the
> self-help remedy of taking the child from the airport.
> To give a legal advantage to an abductor who has a
> perfectly good legal remedy in lieu of abduction yet
> failed to pursue it would be contrary to the Hague
> Convention's goal of discouraging abductions by
> denying to the abductor any legal advantage from the
> abduction. By failing to pursue his legal remedy, [the
> father] enabled [the child] to obtain a habitual
> residence in the country to which her mother took her,
> even if the initial taking was wrongful. For as we
> have seen, there is no doubt that if the circumstances
> in which [the child] was taken to Poland are set to
> one side, by May 2005 she was indeed a habitual
> resident of Poland.

Id. at 588–89.

    This is precisely what occurred here. Respondent had four

years during which he could have filed a petition under the

Hague Convention. Instead, Respondent engaged in a "self-help

abduction," which is what "the Hague Convention is clearly

intended to prevent." Miller, 240 F.3d at 401 n.13.

    It is worth stating that Moreno and Kijowska are not at

odds with Mota and Hofmann. The court reads these four cases

together to stand for the following proposition: if one parent

takes a child to another country against the other parent's

- 22 -

wishes — be that a thwarted intent to relocate as a family, see Hofmann, 716 F.3d at 293; Mota, 692 F.3d at 115, or just absconding with the child — the wronged parent should use the Hague Convention procedures in order to seek the return of their child, not "self-help" methods of re-absconding with the child which fly in the face of the Hague Convention's purposes, see Moreno, 895 F.3d at 924.

The court also notes that both of the respondents in Moreno and Kijowska obtained custody orders from their respective states, neither of which saved them in the face of their inaction under the Hague Convention. Thus, Respondent's custody order from Guilford County does not save him from his own failure to file a Hague petition.

While Petitioner potentially thwarted the couple's original intent to move to Spain as a family, which the court does not find as a matter of fact, Respondent could have filed his own Hague petition.[3] Instead, because he wanted to "keep the temperature down and find a solution," he breached a written

---

[3] Indeed, even if Petitioner's initial removal of J.H.R. to Spain was illegal, Petitioner would likely be able to raise the acclimatization defense to Respondent, because he did not file a Hague petition within one year of her alleged wrongful removal, and Petitioner submitted ample evidence that meets the preponderance standard that J.H.R. was acclimatized to Spain over the four years he lived there with Petitioner.

contract and wrongfully took his child across the Atlantic
Ocean.

Having concluded that Petitioner has proven by a
preponderance of the evidence that J.H.R. was acclimated to
Spain, looking at the evidence regarding parental intent, and
emphasizing the fact that Respondent spent nearly four years in
Spain after the divorce, the court finds that J.H.R.'s
acclimatization trumps any potential disagreement regarding
parental intent "where [Respondent] failed to pursue all treaty-
based remedies in [Spain] to secure [J.H.R.]'s return to the
United States." Id. Petitioner has thus met her burden of
proving that Spain is J.H.R.'s habitual residence by a
preponderance of the evidence. The first prong of the wrongful
removal prima facie test is thus satisfied, as J.H.R. was
"habitually resident" in Petitioner's country, Spain, at the
time he was removed.

## 2. The Removal of J.H.R. was in Breach of Petitioner's Custody Rights Under Spanish Law

Because Spain is J.H.R.'s habitual residence, Spanish law
guides as to whether J.H.R.'s removal was in violation of
Petitioner's custody rights. See Hague Convention, art. 3.

## a. The June 28, 2019 Spanish Order

The Fourth Circuit has deferred to a foreign court's determination that the left-behind parent was exercising custody, on the grounds that the court's determination was reasonable and that the respondent failed to provide any reason to question the foreign court's decision. Miller, 240 F.3d at 400–01.

The Fourth Circuit's analysis in Miller is instructive. In that case, the children lived with the petitioner mother in Ontario, Canada, until the respondent father removed them and took them to Charlotte, North Carolina. Id. at 395. The petitioner mother filed suit under ICARA and the Hague Convention in U.S. District Court. Id. The custody battle there had begun initially in New York family court in 1995, where respondent father filed for custody. Id. at 396. The petitioner mother filed for custody in Ontario in October 1995. Both parties "intermittently appeared in — and failed to appear in — both the New York and Ontario courts." Id. Both parties were admonished by the courts for violating various orders. Id. The petitioner mother then obtained a permanent custody order from the Ontario court in October 1997. Id. After the October 1997 Ontario order in favor of the petitioner mother, the New York court awarded custody of the children to the respondent father in March 1998. Id. The respondent father asked the Ontario

courts twice to set aside the Ontario order in favor of the New York order. Id. at 397. The Ontario court denied his first request and granted his second request. Id. The Court of Appeal for Ontario then reinstated the Ontario order in favor of the petitioner mother. Id.

In August 1998, the respondent father, "ostensibly for the purpose of exercising his rights of supervised visitation under the Ontario Order," took the children to Charlotte, North Carolina without permission. Id. The petitioner mother filed her Hague Convention petition less than one year after the children were taken to the United States. Id.

The district court found that Canada was the children's habitual residence and that the petitioner mother was exercising valid custody rights under Canadian law at the time of the removal. The district court concluded that the petitioner mother proved wrongful removal and that the respondent father's defenses were inapplicable; thus, the children were returned to Canada. Id. at 399.

On appeal, the Fourth Circuit affirmed the district court, finding that "[a]fter reviewing the complex history of litigation in this case, the Ontario Court of Appeal upheld the validity of the Ontario Order — at least pending further proceedings — and denied recognition of the New York Order based on Canadian conflict of law principles." Id. at 400. The Fourth

Circuit found the following: (1) that Canada was the children's habitual residence; and (2) that the Ontario Court of Appeal's disposition was reasonable and thus the Fourth Circuit saw "no reason not to defer to the court's decision," and "reject[ed] [the respondent father's] contentions that [the petitioner mother] wrongfully retained the children in Canada upon issuance of the New York Order," noting that respondent father "failed to provide any authority from Canada undermining this decision or any other reason to question the Ontario court's interpretation of the law of its own country." Id. at 400–01.

There are similarities between the situation in Miller and the situation presently before the court. As in Miller, there are dueling custody orders here – Petitioner received an order for full custody from the Spanish courts, and Respondent received an order for full custody from the Guilford County court. Petitioner submits the June 18, 2019 order from the Spanish Court of First Instance, which concluded that Petitioner had custody rights at the time of the removal. (June 18, 2019 Decision (Doc. 1-4) at 26.)

This court considers the Spanish court to be a competent judicial body, and that court determined that Petitioner was entitled to custody of J.H.R., despite the North Carolina order, at the time Respondent removed J.H.R. from Spain. (Id.) Respondent has not provided "any authority from [Spain]

- 27 -

undermining this decision or any other reason to question the
[Spanish] court's interpretation of the law of its own country."
The court thus sees no reason not to defer to the Spanish
court's findings.

### b. **Spanish Civil Law**

Though the court finds the analysis in Miller dispositive
on the question of custody rights, it will nevertheless address
other sources of Spanish law to determine whether Petitioner had
custody rights at the time of removal.

Custody rights "may arise in particular by operation of law
or by reason of a judicial or administrative decision, or by
reason of an agreement having legal effect under the law of the
State." Hague Convention, art. 3. Article 5(a) of the Hague
Convention provides that "'rights of custody' shall include
rights relating to the care of the person of the child and, in
particular, the right to determine the child's place of
residence." See also Abbott v. Abbott, 560 U.S. 1, 10 (2010).
The Spanish Civil Code provides for the rights of parents. C.C.,
arts. 154–60. The Spanish Civil Code provides that "[i]f the
parents should live separately, parental authority shall be
exercised by the parent with whom the child lives." C.C., art.
156. Parental authority comprises looking after the child,
keeping the child company, feeding the child, educating the

child, and providing them with a comprehensive upbringing. Id. art. 154.

Indeed, the Spanish court in the June 18, 2019 order notes that the Spanish Supreme court has ruled that the decision to transfer the residence of a child is an inherent part of custodial authority, and that in order to change a child's residence, both parents must agree to the change, or there must be a judicial decision, and further, it is not a decision to be made solely by one parent. (June 18, 2019 Decision (Doc. 1-4) at 22-23.)

Petitioner thus had custodial rights that were violated when Respondent took J.H.R. to the United States. It would belie common sense to find that Petitioner's custodial rights were not violated when Respondent took J.H.R.; she ceased to be able to take care of her child or make any decisions regarding his upbringing whatsoever. See Garcia v. Varona, 806 F. Supp. 2d 1299, 1311 (N.D. Ga. 2011) (interpreting Spanish law to find that removing a child violated the custodial rights of the left-behind parent who had partial custody in Spain).

The court concludes that Petitioner had valid custody rights, based in either the June 18, 2019 Spanish order or, alternatively, in Spanish civil law, and therefore finds that

Petitioner has demonstrated by a preponderance of the evidence

that the second prong is satisfied.[4]

---

[4] The court does not find that the Guilford County custody order changes this analysis for two reasons. First, the Spanish courts have declined to enforce the Guilford County order on at least three separate occasions: the Provincial Court chose not to enforce the Guilford County order in its September 26, 2017 decision, and the Court of First Instance twice declined to impose the Guilford County order, first on September 7, 2018, and second on June 18, 2019. Second, the court seriously questions the validity of the service of process on Petitioner. North Carolina has adopted the Uniform Child-Custody Jurisdiction and Enforcement Act. N.C. Gen. Stat. § 50A. That Act explicitly states that, for persons outside of North Carolina, which Petitioner was and still is, notice "may be given in a manner prescribed by the law of this State for service of process . . . . Notice must be given in a manner reasonably calculated to give actual notice . . . ." N.C. Gen. Stat. § 50A-108(a). The North Carolina Rules of Civil Procedure state that service may be made "[b]y mailing a copy of the summons and of the complaint, registered or certified mail, return receipt requested, addressed to the party to be served, and delivering to the addressee." N.C. Gen. Stat. § 1A-1, Rule 4(j)(1)(c). Here, Respondent's attorney certified that Petitioner had been served by United States Mail, First Class, to her "last known address," which happened to be the Greensboro address of Petitioner and Respondent's house. (Guilford County Order (Doc. 10-1) at 4; Min. Entry 11/21/2019.) Petitioner was in Spain for the entire duration of this action, as was Respondent. Respondent testified that he told his lawyer that everyone involved was in Spain. (Min. Entry 11/21/2019.) Respondent contends that Petitioner was properly served in Spain as well, (id.), though the court finds his testimony on this issue unconvincing. Moreover, while the June 18, 2019 order notes that the Provincial Court found that Petitioner knew of the Guilford County claim in November 2014, (June 18, 2019 Decision (Doc. 1-4) at 18), this does not rectify any procedural deficiencies that may have occurred. Mailing service to a Greensboro address was not "reasonably calculated to give actual notice" of the hearing. The court thus finds that the enforceability of the Guilford County custody order is lacking and credits the Spanish decisions choosing not to enforce the order.

**3. Petitioner was Exercising Her Custody Rights at the Time of Removal**

Regarding the final prong, whether Petitioner was actually exercising her custodial rights, Petitioner must establish that, at the time of removal, her custody rights were "actually exercised, either jointly or alone, or would have been so exercised but for the removal." Hague Convention, art. 3(b). The Fourth Circuit held that "a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Bader, 484 F.3d at 671.

Here, Petitioner was clearly exercising her custody rights. She and J.H.R. lived together and she cared for the child. Respondent admits that Petitioner was the main caregiver of J.H.R. for the four years they were living in Spain. There has been no evidence presented demonstrating Petitioner clearly and unequivocally abandoned the child. This prong is satisfied. With respect to custody rights and the exercise of those custody rights, this court alternatively finds Respondent recognized the rights of Petitioner by executing a written agreement requiring return of the child on or about August 31, 2018.

Petitioner has therefore established a prima facie case of wrongful removal under the Hague Convention.

**B.  Respondent's Defenses**

Respondent raises several defenses, which the court will address in turn.

**1.  Failure to State a Claim**

Respondent alleges that Petitioner's petition "does not meet minimum standards of credibility," because she "failed to provide a complete procedural history," and because the "Spanish court had no jurisdiction in 2014." (Answer (Doc. 5) ¶¶ 62–64.) This is essentially a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

When ruling on a motion to dismiss, a court must accept the complaint's factual allegations as true. Iqbal, 556 U.S. at 678.

Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004).

Nevertheless, sufficient factual allegations must "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see also Iqbal, 556 U.S. at 680.

Here, Petitioner plainly meets the plausibility standard on all aspects of her claim. She submits several facts that support a plausible allegation that J.H.R.'s habitual residence was in Spain, (Verified Pet. (Doc. 1) ¶¶ 14–21), that she had custodial rights, (id. ¶¶ 14, 17, 19, 21), and that Respondent violated those rights by taking the child to the United States, (id. ¶¶ 22–23.) Because Petitioner has submitted sufficient facts to state a claim under the Hague convention, this defense fails.

### 2.    **Unclean Hands**

Respondent raises the defense of unclean hands. (Answer (Doc. 5) ¶¶ 65–71.) He alleges that Petitioner "fled the jurisdiction where the marital home was located for the specific purpose of avoiding the Guilford County courts," and that she failed to tell Respondent that she was contemplating divorce. (Id. ¶ 66.) He further alleges that she obtained his permission to take J.H.R. to Spain "by fraud, inducing him through deceit

and subterfuge to allow her to take their Child and both of the
Child's passports to Spain." (Id. ¶ 67.)

"Unclean hands" is not a supported defense to a Hague
Petition. The Third Circuit held that applying the unclean hands
doctrine "would undermine the Hague Convention's goal of
protecting the well-being of the child, of restoring the status
quo before the child's abduction, and of ensuring 'that rights
of custody and of access under the law of one Contracting State
are effectively respected in the other Contracting States.'"
Karpenko v. Leendertz, 619 F.3d 259, 265 (3d Cir. 2010) (quoting
Hague Convention, art. 1(b)). The Fourth Circuit has also stated
that the doctrine of equitable estoppel — an equitable remedy
like the doctrine of unclean hands — is inapplicable in Hague
Convention cases. Katona v. Kovacs, 148 F. App'x 158, 161 (4th
Cir. 2005). This court is thus convinced by these cases that
equitable relief is not a proper defense under the Hague
Convention.

Even so, as discussed above, see supra Part II.A.1.c,
Respondent should have filed his own Hague petition at the time
he discovered his wife wanted a divorce; taking your child
across an ocean without consent is not a proper solution four
years after Petitioner's alleged fraudulent behavior. For the
reasons stated above, the court finds this defense without
merit.

## **3.    Full Faith and Credit, Res Judicata, and *Rooker-Feldman***

Respondent also argues that foreign judgments are not entitled to full faith and credit. "[T]hough foreign judgments are not entitled to full faith and credit, comity is at the heart of the Hague Convention." Smedley v. Smedley, 772 F.3d 184, 189 (4th Cir. 2014) (internal quotation marks omitted). American courts will thus "normally accord considerable deference to foreign adjudications as a matter of comity." Miller, 240 F.3d at 400. The Fourth Circuit approving quoted the Ninth Circuit's framework for extending comity in Hague Convention cases: "[W]e may properly decline to extend comity to the [foreign] court's determination if it clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness." Smedley, 772 F.3d at 189 (quoting Asvesta v. Petroutsas, 580 F.3d 1000, 1014 (9th Cir. 2009)).

Indeed, the Fourth Circuit has stated that, in dealing with competing custody orders under the Hague Convention, "it is significant to recognize that 'the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence.'" Miller, 240 F.3d at 399 (quoting Ohlander v. Larson, 114 F.3d 1531, 1541 (10th Cir. 1997)).

This court therefore will extend comity to the Spanish court's June 18, 2019 custody decision, as there has been no showing that the Spanish court "contravene[d] the Convention's fundamental premises or objectives, or fail[ed] to meet a minimum standard of reasonableness."

Further, the court also determined that Petitioner had and was exercising custody rights under general Spanish law, notwithstanding the Spanish court order. This defense thus fails.

Respondent further claims that the doctrine of res judicata prevents Petitioner from bringing her Hague petition. This argument flies in the face of the purposes of the Hague Convention. The Ninth Circuit addressed the issue in Holder v. Holder, 305 F.3d 854 (9th Cir. 2002). There the court addressed the issue of whether decided or pending state court custody proceedings precluded a Hague petition under the doctrine of res judicata. The Ninth Circuit found that:

> [i]t would also undermine the very scheme created by the Hague Convention and ICARA to hold that a Hague Convention claim is barred by a state court custody determination, simply because a petitioner did not raise his Hague Convention claim in the initial custody proceeding. The Hague Convention provides that children are not automatically removed from its protections by virtue of a judicial decision awarding custody to the alleged abductor. Indeed, the typical Hague Convention case involves at least the potential for two competing custody orders, one in the children's "habitual residence," and one in the country to which the children have been taken. To hold

that a left-behind parent is barred, in such a case,
from raising a Hague Convention claim in a subsequent
federal proceeding just because he or she did not
raise it in the state custody proceeding would render
the Convention an incompetent remedy for the very
problem that it was ratified to address.

Id. at 865. The Ninth Circuit then held that "federal courts

adjudicating petitions under the Hague Convention must accord

preclusive effect only to those state court judgments ordering

or denying the return of a child pursuant to the Hague

Convention in an action under ICARA." Id. at 866.

While not a perfect factual match, the court here finds

that the underlying reasoning of Holder — allowing state custody

proceedings to bar Hague petitioner would render the Hague

Convention incompetent — compelling and adopts it here. The

court thus finds that none of the prior custody proceedings bar

Petitioner's Hague petition.

Finally, Respondent's contention that the Rooker-Feldman

doctrine bars this court from adjudicating Petitioner's Hague

petition is similarly without merit. (Answer (Doc. 5) ¶ 85.) At

least two courts of appeal have held that the Rooker-Feldman

doctrine does not apply to Hague Convention cases. In Silverman

v. Silverman, 338 F.3d 886, 895 (8th Cir. 2003), the Eighth

Circuit held that "[the respondent's] argument that a state

court custody decision can somehow trump clearly granted federal

court jurisdiction to decide and review issues of

congressionally adopted policy and procedure is simply untenable," and that the "Rooker-Feldman doctrine has no application under the circumstances of this case." The Ninth Circuit, in Mozes, 239 F.3d at 1085 n.55, similarly found that where "Congress has specifically granted jurisdiction to the federal courts, the [Rooker-Feldman] doctrine does not apply," as is the case with the Hague Convention. We agree with the analyses of these cases and thus apply them here. Respondent's argument thus is without merit.

## 4.    J.H.R.'s Wishes, the Well-Settled Defense, and J.H.R.'s Best Interests

Respondent also contends that J.H.R. wishes to stay in North Carolina with Respondent, that he is "well settled" in the United States, and that it is in his best interest to stay in North Carolina. (Answer (Doc. 5) ¶¶ 95–99.)

The court first finds that the "well settled" defense may not be asserted here. This defense may be asserted only when an "action [is] not commenced within one year of the abduction." Miller, 240 F.3d at 399. Here, Petitioner filed her Hague petition within one year and thus this defense is inapplicable. The court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention,

- 38 -

art. 13. A respondent has the burden of proving this by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). "However, "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986). Because the Convention does not set forth a particular age at which a child's opinion should be considered, the court must make a fact-based inquiry. See de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007).

After conducting an in camera interview with J.H.R., the court found that J.H.R. has not reached an age and degree of maturity such that it is appropriate to consider his opinions as to where he wanted to live, nor did J.H.R. express a preference for one parent over the other. Indeed, the court found that J.H.R. seemed to have been subjected to unfair manipulation at the hands of Respondent. The court therefore finds that Respondent has not carried his burden of demonstrating by a preponderance of the evidence that J.H.R. has achieved an age and degree of maturity sufficient to overcome Petitioner's prima facie case. This defense fails.

Respondent also argues that returning J.H.R. to Spain would not be in the child's best interests under the Hague Convention. (Answer (Doc. 5) ¶ 99.) However, as the Supreme Court has

stated, it is the courts of the child's habitual residence that are to make this determination, and that "[i]t is the Convention's premise that courts in contracting states will make this determination in a responsible manner." Abbott, 560 U.S. at 20. As a District Court in the Eastern District of Virginia stated,

> the focus of a court's inquiry in a Hague Convention case is not "the best interests of the child," as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country different from the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence.

Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 610–11 (E.D. Va.), aff'd, 52 F. App'x 207 (4th Cir. 2002). Thus, it is not this court's duty to make a determination of what is in the child's best interests and, as such, it will refrain from doing so.

## 5. Respondent's Other Defenses

Respondent contends that the Spanish decision is void because the Spanish court violated his due process rights. (Answer (Doc. 5) ¶¶ 72–79.) The Spanish appellate court agreed with Respondent and nullified the order. (June 18, 2019 Decision (Doc. 1-4) at 18–19.)

Respondent further argues that North Carolina courts has sole jurisdiction over this case. (Answer (Doc. 5) ¶¶ 89–92.)

Having determined that Spain was the child's habitual residence, the Hague Convention dictates that the court look to Spanish law to determine whether Petitioner had custody rights; determining which country had jurisdiction is not for this court to decide. See Smedley, 772 F.3d at 186.

The court finds these arguments to be without merit and thus these defenses fail.

**III. CONCLUSION**

For the reasons set forth above, the court finds that the return of J.H.R. to Spain for an adjudication of child custody will thus be ordered.

**IT IS THEREFORE ORDERED** that Petitioner's Verified Petition for Return of a Child Under the Convention on the Civil Aspects of International Child Abduction, (Doc. 1), is **GRANTED**. At 9:00 a.m. on December 20, 2019, Respondent shall bring the minor child, J.H.R., to the L. Richardson Preyer Courthouse at 324 West Market Street, Greensboro, North Carolina. At that time, Respondent will allow Petitioner's brother, Juan Rodriguez Palomo, and Petitioner's niece, Elena Torres Rodriguez, to take physical custody of the child in order to transport the child to Madrid, Spain. At the time of this exchange, Respondent will deliver to Juan Rodriguez Palomo and Elena Torres Rodriguez the child's passport and sufficient clothing, personal care items,

and medicines (if any) needed by the child to enable the child to travel back to Spain.

The U.S. Marshals Service is **DIRECTED** to supervise the exchange of the child from Respondent to Juan Rodriguez Palomo and Elena Torres Rodriguez, and to assist in the execution of this Order as necessary.

All federal, state, and local law enforcement agencies are hereby **NOTIFIED** that Juan Rodriguez Palomo and Elena Torres Rodriguez are duly authorized to travel with the child from the United States to Madrid, Spain, between the dates of December 20, 2019, and December 22, 2019, in order to deliver the child to Petitioner in Madrid. Either party may move for reconsideration of this date and, if such a motion is filed, a response shall be filed, if at all, within three days, or not later than forty-eight hours before the scheduled departure time, whichever time occurs first. Respondent shall not remove J.H.R. from the Middle District of North Carolina without permission of the court. Respondent shall keep Petitioner's counsel informed of a current address and telephone number for Respondent and J.H.R.

**IT IS FURTHER ORDERED** that Respondent's Motion to Dismiss, (Doc. 14), Respondent's Motion for Summary Judgment, (Doc. 13), and Respondent's Motion for Reconsideration, (Doc. 15), are **DENIED**.

**IT IS FURTHER ORDERED** that, due to Respondent voluntarily withdrawing his Counterclaims, (Doc. 7), Petitioner's Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6), (Doc. 9), is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Order Definitively Setting the Date, Time, and Manner of the Child's Return, (Doc. 17), and Petitioner's Motion for Expedited Consideration of Petitioner's Motion for Order, (Doc. 19), are **DENIED AS MOOT.**

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 6th day of December, 2019.

_William L. Osteen, Jr._
United States District Judge